THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARTA MILLER,

               Plaintiff,

     v.

BOYS & GIRLS CLUBS OF
SNOHOMISH COUNTY,

               Defendant.

CASE NO. C15-2027-JCC

ORDER

This matter comes before the Court on Defendant Boys & Girls Club of Snohomish County's motion for summary judgment (Dkt. No. 22) and the parties' stipulated motion to seal documents attached to Defendant's motion for an independent medical exam (Dkt. No. 33). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion for summary judgment and GRANTS the motion to seal for the reasons explained herein.

I.      BACKGROUND

A.      Employment History

Plaintiff Marta Miller, an African American woman, began working at Defendant's Monroe club in 2011 as a youth leader. (Dkt. No. 1 at ¶ 1.1; Dkt. No. 23 at 6.) In September 2011, the Unit Director of the Monroe Boys & Girls Club (BGC), Mike Wetmore promoted her

to Program Director. (Dkt. No. 23 at 6; Dkt. No. 28-2 at 2.) In November 2011, Mr. Wetmore completed Plaintiff's performance evaluation and gave her scores in the range of 3 to 5 (satisfactory to excellent, respectfully). (Dkt. No. 28-4 at 3–4.) Mr. Wetmore praised her hard work and effort but also included specific areas for improvement, including that Plaintiff needed "to make sure her work space and the club's appearance [were] always a priority." (*Id.* at 3.)

## B.    2013 Incident with Mr. Wetmore

On May 21, 2013, Mr. Wetmore returned to the Monroe BGC and noticed that "there was garbage all over in front of" the club that had been left by teenagers who had been at the BGC. (Dkt. No. 23 at 122.) Mr. Wetmore went inside to the front office and instructed Plaintiff to go outside and pick up the trash. (*Id.* at 9, 122.) A white, male employee, Sam Faidley, was also on duty that day. (Dkt. No. 28-6 at 6; Dkt. No. 29 at ¶ 4.) Plaintiff responded that the teens should clean up the trash and refused to do it herself. (Dkt. No. 23 at 9.) Then, Mr. Wetmore put "two hands on [Plaintiff's] shoulders and turned her toward the door" to go clean up the trash. (*Id.* at 122.) At her deposition, Plaintiff testified that Mr. Wetmore "walked towards [her] in a threatening manner and scared [her] and grabbed [her] on [her] right shoulder with his hand and tried to pull [her] out of the office in front of the kids." (*Id.* at 9.) Mr. Wetmore acknowledged that it was inappropriate for him to touch Plaintiff in that way. (Dkt. No. 28-6 at 14–15.) Mr. Wetmore testified that "it was frustrating because [trash in front of the BGC] had been happening over and over again for several days" and he had told Plaintiff to address the issue multiple times before. (Dkt. No. 23 at 122.)

Plaintiff believes that Mr. Wetmore's actions were motivated by her race. (*Id.* at 9.) However, Plaintiff admitted that Mr. Wetmore never did or said anything to refer to her race. (*Id.* at 9–10.) Plaintiff also admitted that she has no knowledge of Mr. Wetmore ever saying or doing anything of a racist nature.[1] (*Id.* at 10.)

---

[1] Defendant also states in its briefing that Plaintiff "admitted during her deposition that she has no knowledge of anyone at the BGC (including Mr. Wetmore) ever saying or doing anything of a racist nature." (Dkt. No. 22 at 5.) However, the pages of the deposition Defendant cites were not provided to the Court.

1    The next day, the Regional Director, Marci Volmer; the HR Director, George Morrison;

2    and the Area Director, Mike Neumeister, met with Plaintiff and Mr. Wetmore about the incident.

3    (*Id.* at 10, 124.) Plaintiff was issued a notice of staff discipline for "insubordination to [a]

4    supervisor including inappropriate language, volume, and tone both in front of members and in

5    the office." (Dkt. No. 28-17.) Shortly after that, Plaintiff was transferred to another BGC location

6    with the same title and pay. (Dkt. No. 23 at 125; Dkt. No. 28-10 at 13; Dkt. No. 28-21 at 2.) Mr.

7    Wetmore testified that he did not recall receiving a notice of discipline and he did not suffer any

8    sort of dock in pay or reduction of benefits. (Dkt. No. 28-6 at 18–19.) There is no evidence to the

9    contrary.

10    On May 29, 2013, the Snohomish Branch of the National Association for the

11    Advancement of Colored People (NAACP) sent a memorandum to Defendant that it intended to

12    investigate Plaintiff's claim that Mr. Wetmore "assaulted her physically and was verbally

13    abusive" and that "the treatment she received was racially motivated." (Dkt. No. 28-22 at 2.)

14    Defendant took no action in regards to the letter because it believed the language contained

15    within the letter, that the NAACP would contact Defendant in a few days, required no immediate

16    action. (Dkt. No. 28-23 at 5.)

17    In June 2013, Ms. Volmer contacted Plaintiff to ask her to return to the Monroe BGC at

18    the request of Mr. Wetmore. (Dkt. No. 23 at 11.) Plaintiff accepted the transfer, acknowledged

19    that she and Mr. Wetmore would have "weekly/monthly meetings with [Ms. Volmer]", and

20    asked to receive training in management, conflict resolution, and communication. (*Id.* at 91.)

21    Plaintiff and Mr. Wetmore also signed a "Moving Forward Action Plan." (*Id.* at 130.) Upon her

22    return to her original position at her original location, management asked her to sign a "Hold

23    Harmless Agreement" to release all her claims against Defendant. (Dkt. No. 28-12 at 14–15.)

24    Plaintiff also wrote to the NAACP that "the matter . . . [had] been resolved." (Dkt. No. 23 at 93.)

25    **C.    2013 Unit Director Position**

26    In September 2013, Mr. Wetmore requested a transfer to the Lake Stevens club. (*Id.*

at 126.) This created an opening at the Monroe club for the Unit Director position. Plaintiff emailed Ms. Volmer about her interest in the job. (Dkt. No. 28-26 at 2.) Ms. Volmer stated at her deposition that she cannot remember if Plaintiff applied for the 2013 opening and does not recall encouraging Plaintiff to apply or discouraging Plaintiff from applying. (Dkt. No. 28-7 at 13–15.) However, Plaintiff claims in her declaration that after she sent the email, Ms. Volmer "called [her] to inform [her] that it was 'too soon' after [her] complaint to the NAACP for the Club to consider [her] for the Unit Director vacancy." (Dkt. No. 29 at ¶ 8.)[2] In the end, the Monroe BGC hired Angie Schab for the position. (Dkt. No. 28-7 at 67.)

In February 2014, Ms. Volmer, due to Ms. Schab's absence, completed Plaintiff's performance evaluation and gave her scores in the range of 3 to 5. (Dkt. No. 28-5 at 2.) Ms. Volmer stated that Plaintiff should continue to work on conflict resolution strategies and learn management skills such as budgets, staff mentoring, fundraising, and donor relations. (*Id.* at 3.)

In April 2014, Plaintiff was awarded a University of Phoenix Boys and Girls Club of America Scholarship.[3] (Dkt. No. 28-9 at 2; Dkt. No. 29 at ¶ 3.) Ms. Schab sent out an email to the Monroe BGC club announcing Plaintiff's scholarship and congratulating Plaintiff on her accomplishment. (Dkt. No. 28-9 at 2.)

### D.   2014 Unit Director Position

In August 2014, Ms. Schab's employment at the Monroe BGC ended, and Ms. Volmer asked Plaintiff if Plaintiff would take on additional duties as interim Unit Director.[4] (Dkt. No.

---

[2] Defendant objects to this portion of Plaintiff's declaration as hearsay. (Dkt. No. 31 at 2 (citing Fed. R. Civ. P. 56(c)(4).) However, a statement that is offered against Defendant and made by one of Defendant's employees, while she was employed by Defendant and was authorized to make such statements, is an opposing party statement and a hearsay exemption. *See* Fed. R. Evid. 801(d)(2).

[3] Defendant also claims that it encouraged Plaintiff to apply for this scholarship and gave her a "glowing reference." (Dkt. No. 22 at 6.) However, the deposition page cited was not provided to the Court.

[4] Defendant also discusses this point in its briefing and also cites the same page of the Volmer Deposition as Plaintiff. (Dkt. No. 22 at 6.) However, again, this page is not included with Defendant's supporting evidence, but is included with Plaintiff's, along with an email to the BGC Advisory Committee announcing Plaintiff's new role. Moreover, Defendant's briefs are replete with instances of unsupported statements of fact. The Court is grateful for Plaintiff's complete and all-inclusive evidentiary submission and briefing citations to fill in the gaps.

28-7 at 3; Dkt. No. 28-27 at 2–3.) Ms. Volmer encouraged Plaintiff to apply for the permanent position, (Dkt. No. 28-7 at 3), and Plaintiff submitted her application on September 5, 2014, (Dkt. No. 28-31 at 2). Plaintiff was one of three applicants selected for the final interviews. (Dkt. No. 23 at 112.) Another final interviewee was Jeffrey Rasmussen, a member of the Monroe City Council with bank management experience. (Dkt. No. 28-35 at 2.) A three-person panel consisting of George Morrison, the BGC HR Director; Ms. Volmer; and Mr. Neumeister interviewed all three final applicants. (Dk. No. 28-12 at 20–21.) Plaintiff claims that Mr. Morrison asked during her interview if she regretted bringing a complaint to the NAACP. (Dkt. No. 28-10 at 17–18.) Mr. Morrison denied asking any questions about the subject but said that his feeling, in general, was that issues should be resolved "at the lowest level" possible. (Dkt. No. 28-12 at 27–30.). Mr. Neumeister did not remember if that question had been asked, (Dkt. No. 28-13 at 5–7), but Ms. Volmer remembered the question, (Dkt. No. 28-7 at 21–24). Plaintiff was also asked if she could have handled the incident and confrontation with Mr. Wetmore in a different manner. [5] (Dkt. No. 28-10 at 21.) After the interview, Plaintiff told her friend who worked at the Monroe BGC that she "blew her interview." (Dkt. No. 23 at 96.)

Ultimately, Defendant decided to hire Mr. Rasmussen as the new Unit Director for the Monroe Club. (Dkt. No. 28-28 at 3.) According to Defendant, Mr. Rasmussen was hired due to his financial experience because the panel wanted "to bring in someone who would . . . do it totally different, look at it with different eyes and kind of start fresh." (Dkt. No. 28-7 at 19–20.)

**E.    Plaintiff's Resignation**

On December 2, 2014, Plaintiff, Mr. Rasmussen, and Ms. Volmer had a meeting. (Dkt. No. 23 at 119.) After the meeting, Ms. Volmer wrote Plaintiff an email stating that she knew Plaintiff was "not happy with the situation, but [Plaintiff's] very evident attitude towards [Mr.

---

[5] Defendant alleges that "[d]uring the interview, they discussed the incident with Mike Wetmore and asked [Plaintiff] if she could have handled the incident better. She was defensive and refused to acknowledge that she could have handled the incident better." (Dkt. No. 22 at 7.) However, this assertion has no citations to any of the supporting evidence and is not supported by the evidence provided. In fact, Plaintiff refused to acknowledge that she could have handled the incident better at her *deposition*. (Dkt. No. 23 at 13; Dkt. No. 28-10 at 22.)

Rasmussen] was unacceptable."[6] (*Id.*) Additionally, Mr. Rasmussen noted after a meeting with Plaintiff on February 3, 2015, that she was not properly communicating with him and inappropriately overstepping her boundaries, including asking staff to follow her instructions rather than his. (*Id.* at 143–45.) It is clear from a cover letter dated February 18, 2015, that Plaintiff started applying for other jobs shortly after this meeting. (*Id.* at 97.)

On February 20, 2015, Mr. Rasmussen completed Plaintiff's annual performance review and gave her mostly 3s (satisfactory) and some 2s (below average). (Dkt. No. 28-38 at 2.) He described her strengths, including positive interactions with children and their parents, and noted that she needed to improve her communication with him and being open to criticism. (*Id.* at 3.) Mr. Rasmussen also included goals for 2015. (*Id.*)

On February 21, 2015, Plaintiff submitted her resignation, stating that her last day would be March 6, 2015. (Dkt. No. 28-39 at 2–3.) On February 25, 2015, Plaintiff was unable to log in to her BGC user account and emailed Ms. Volmer and Mr. Morrison that she was resigning "effective immediately." (Dkt. No. 23 at 99.)

On December 10, 2015, Plaintiff filed a complaint against Defendant alleging (1) race discrimination in violation of 42 U.S.C. § 1981 and Washington's Law Against Discrimination (WLAD) and (2) retaliation in violation of § 1981 and WLAD. (Dkt. No. 1 at 3–4.) Defendant now moves for summary judgment on all claims. (Dkt. No. 22.)

## II.   MOTION FOR SUMMARY JUDGMENT

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[6] Plaintiff claims that Ms. Volmer spoke with Mr. Rasmussen when he started and warned him to be "leery" of Plaintiff because of her previous issues with Mr. Wetmore. (Dkt. No. 27 at 14) (citing Dkt. No. 28-28 at 5–8, 20). However, the deposition says no such thing. The deposition testimony states just that Ms. Volmer had told Mr. Rasmussen that Plaintiff had applied for the position. (Dkt. No. 28-28 at 7–8.) Mr. Rasmussen said the topic of the Mr. Wetmore incident "came up in conversation", not that he was warned. (*Id.* at 21.) He also states, unequivocally, that Plaintiff's filing of a NAACP complaint did *not* make him wary of working with her. (*Id.* at 20.)

Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn there from in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B.     2013 Unit Director Position

As a preliminary matter, the Court must first address Plaintiff's claims that she was discriminated and retaliated against when Ms. Volmer told her it was "too soon" after her NAACP complaint to apply for the 2013 Unit Director position. (Dkt. No. 27 at 20, 26; Dkt. No. 29 at ¶ 8.) However, Ms. Volmer stated in her deposition that she does not remember saying that to Plaintiff and doubts she would have said something like that. (Dkt. No. 28-7 at 13–15.) Genuine disputes of fact remain whether this statement actually happened. Summary judgment on this issue is, therefore, inappropriate. The Court will not consider this claim in its analysis and the motion for summary judgment on the discrimination and retaliation claims in relation to the 2013 Unit Director position is DENIED.

### C.     Race Discrimination Claims

Both § 1981 and WLAD protect employees from discrimination on the basis of race. *See*

42 U.S.C. § 1981; Wash. Rev. Code § 49.60.180. When analyzing § 1981 and WLAD claims, courts apply the same legal principles as those applicable in a Title VII disparate treatment case. *See Metoyer v. Chassman*, 504 F.3d 919, 930 (9th Cir. 2007); *Grimwood v. Univ. of Puget Sound, Inc.*, 753 P.2d 517, 520 (Wash. 1988). There are two models applicable to such discrimination cases: the *McDonnell Douglas*[7] burden-shifting framework and the "mixed-motives" framework established in *Pricewaterhouse v. Hopkins*, 490 U.S. 228 (1989). The parties disagree which standard the Court should apply for the discrimination claims. Defendant suggests the *McDonnell Douglas* burden shifting analysis, (Dkt. No. 22 at 11–12), while Plaintiff offers the mixed-motives approach, (Dkt. No. 27 at 17).

As a preliminary matter, "although the *McDonnell Douglas* burden shifting framework is a useful tool to assist at the summary judgment stage . . . nothing compels the parties to invoke the *McDonnell Douglas* presumption." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (citation and internal quotation marks omitted). Instead, "when responding to a summary judgment motion . . . [the plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *Id.* "*McDonnell Douglas* and 'mixed-motive' are not two opposing types of cases." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 857 (9th Cir. 2002), *aff'd*, 539 U.S. 90 (2003).

Despite the existence of these two avenues of analysis, the "employee's ultimate burden of proof in all cases remains the same: to show by a preponderance of the evidence that the challenged employment decision was because of discrimination." *Id.* Thus, when responding to a summary judgment motion, a plaintiff may choose whether to proceed under *McDonnell Douglas*, the mixed-motives framework, or both. *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005). The Court need only decide whether there is a possibility of mixed motives before submitting the case to a jury. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061,

---

[7] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

1071 (9th Cir. 2004). Therefore, at this early phase, it is inappropriate for the Court to decide which model better fits this case, and the Court accordingly will consider both. *Dominguez-Curry*, 424 F.3d at 1042 n.7.

Under *McDonnell Douglas*, Plaintiff must first establish the prima facie case that (1) she is a member of a protected class; (2) she was treated less favorably than an employee outside her protected class in the terms and conditions of her employment; and (3) the employee outside her protected class was similarly situated and doing substantially the same work. *McDonnell Douglas*, 411 U.S. at 802. Establishing the prima facie case is a minimal burden, and does not rise to the level of the preponderance of the evidence standard. *Dominguez-Curry*, 424 F.3d at 1037. Second, if Plaintiff is able to prove the prima facie case, the burden shifts to Defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. Finally, should Defendant carry this burden, Plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by Defendant were not its true reasons, but were a "pretext" for discrimination. *Id.* at 804.

Alternatively, Plaintiff may show that even if not all stated legitimate reasons must fail, that discrimination nevertheless "motivated" Defendant's actions to some degree under the mixed-motives framework. *Lahrichi v. Lumera Corp.*, 2006 WL 521659, at *11 (W.D. Wash. Mar. 2, 2006).

### 1. Prima Facie Case

*Member of a protected class*: It is undisputed that Plaintiff is a member of a protected class as an African American woman. (Dkt. No. 1 at ¶ 1.1.)

*Less favorable treatment*: Plaintiff makes 4 different claims allegedly demonstrating less favorable treatment. Plaintiff claims she was treated less favorably because of her race when

(1) "Mr. Wetmore singled her out, as the only African American female, to clean the trash from in front of the Monroe Club";
(2) she was given an admonishment in her personnel file and transferred to a different worksite, while Mr. Wetmore did not suffer either;

(3) "the club impermissibly considered [Plaintiff's] race and association with the NAACP when she interviewed for the Unit Director position in 2014" because the interviewers asked if she regretted her decision to file a complaint; and

(4) "Mr. Rasmussen subjected her to heightened and unfair scrutiny about her work."

(Dkt. No. 27 at 19–21.)

Construing the evidence in the light most favorable to the non-moving party, Plaintiff has met her minimal burden with all of the allegations. (Dkt. No. 23 at 9, 122 (claim 1); Dkt. No. 28-17 and Dkt. No. 23 at 125 (claim 2); Dkt. No. 28-10 at 17–18 (claim 3); Dkt. No. 28-28 at 19 and Dkt. No. 28-38 at 2 (claim 4).) Plaintiff has established she received less favorable treatment on all 4 claims.

*Similarly situated and non-protected*: In regards to Plaintiff's first claim, Mr. Wetmore stated at his deposition that he did not know if Mr. Faidley was on duty that day when he came into the Club to ask Plaintiff to clean up the trash. (Dkt. No. 28-6 at 6.) He only knew after the fact that another, similarly situated and non-protected employee was on duty. (*Id.*) Plaintiff has provided only her belief that Mr. Faidley was working that day and he is Caucasian. (Dkt. No. 29 at ¶ 4.) She has not provided any evidence to show that Mr. Wetmore knew Mr. Faidley was on duty. Therefore, Plaintiff has not demonstrated that Mr. Wetmore treated a similarly situated, non-protected employee differently than her when he asked her to clean up the trash in front of the BGC. The motion for summary judgment on this claim is GRANTED.

Similarly, in regards to her second claim, Plaintiff cannot demonstrate that Mr. Wetmore was similarly situated and doing substantially the same work. Mr. Wetmore was the Unit Director and Plaintiff's supervisor as a Program Director. Their roles at the Monroe BGC were very different and required them to do different work. The Court acknowledges that Mr. Wetmore was treated differently than Plaintiff after their 2013 incident, notably that Plaintiff was transferred while Mr. Wetmore was not and that Plaintiff received a notice of staff discipline while Mr. Wetmore did not. Yet, although it is uncontroverted that Mr. Wetmore's behavior was inappropriate, Plaintiff cannot make out the prima facie case for this alleged less favorable

treatment because she and Mr. Wetmore were not similarly situated employees. The motion for summary judgment on this claim is GRANTED.

Plaintiff has shown for her third race discrimination claim that a similarly situated non-protected applicant, Mr. Rasmussen, was treated more favorably than Plaintiff was by getting the 2014 Unit Director job. (Dkt. No. 28-28 at 3.) Therefore, Plaintiff has met her prima facie case burden for this claim.

Finally, Plaintiff has not provided any evidence for her fourth claim that Mr. Rasmussen was less harsh on similarly situated non-protected employees. All Plaintiff has provided is her belief that she was treated unfairly. She seems to allege that Mr. Rasmussen was implicitly biased against her because she is African American. Although the Court acknowledges that implicit biases can affect employee-employer interactions in a negative way, a belief that this is happening is not enough to establish the prima facie case. Therefore, the motion for summary judgment on this claim is GRANTED.

In sum, the motion for summary judgment is GRANTED as to discrimination claims 1, 2, and 4. However, Plaintiff has provided enough evidence to prove the prima facie case of claim 3. The Court, therefore, moves to the nondiscriminatory reason and pretext or motivating factor analysis on this claim.

### 2. Legitimate Nondiscriminatory Reason

Defendant has provided evidence, in the form of Ms. Volmer's deposition, that Mr. Rasmussen was hired for the 2014 position because of his financial experience. (Dkt. No. 28-7 at 19–20.) This is an adequate nondiscriminatory reason not to hire Plaintiff, who did not have the same financial experience. Therefore, Defendant has met its burden.

### 3. Pretext and Motivating Factor

The Court now turns to Plaintiff's burden to produce sufficient evidence to raise a genuine issue of material fact showing either that Defendant's stated legitimate reasons are pretextual or that, even if not all stated legitimate reasons must fail, that discrimination

nevertheless "motivated" Defendant's actions to some degree under the mixed-motives framework. *Lahrichi*, 2006 WL 521659, at *11. In proffering evidence on summary judgment under either the pretext or the mixed-motives theory, an employee's evidence may be either direct or circumstantial. *Desert Palace Inc. v. Costa*, 539 U.S. 90, 101–02 (2003). Direct evidence is that, which, "if believed, proves the fact [of discriminatory animus] without inference or presumption." *Dominguez-Curry*, 424 F.3d at 1038. "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence." *Desert Palace*, 539 U.S. at 100. Plaintiff may show pretext either (1) directly, "by showing that unlawful discrimination more likely motivated the employer" or (2) indirectly, "by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez-Curry*, 424 F.3d at 1037. In sum, Plaintiff must raise a genuine issue of material fact that would show that Defendant's reasons were pretextual or, even if some of Defendant's reasons were legitimate, that discrimination also motivated the decision.

Plaintiff argues that pretext is established because the selection criteria for the Unit Director position in 2014 included "subjective criteria about 'financial things.'" (Dkt. No. 27 at 24.) However, there is no direct or circumstantial evidence that Defendant's interest in hiring someone with financial experience was a pretextual reason for not hiring Plaintiff. To the contrary, there is evidence that Defendant recommended in Plaintiff's performance reviews that she learn more about finances. (Dkt. No. 28-5 at 3.)

However, it is undisputed that Plaintiff was asked about her NAACP complaint at her interview. (Dkt. No. 28-12 at 20–21; Dkt. No. 28-7 at 21–24.) The actual questions asked and the information sought from such questions is disputed, but a reasonable trier of fact could find that asking about a complaint to a preeminent legal organization dedicated to advancing the civil liberties of African Americans is circumstantial evidence that unlawful race discrimination motivated Defendant in its decision not to hire Plaintiff in 2014. In an employment discrimination dispute, a plaintiff generally needs to "produce very little evidence in order to

1    overcome an employer's motion for summary judgment." *Chuang v. Univ. of Cal. Davis, Bd. Of*

2    *Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000). This is because "the ultimate question is one that

3    can only be resolved through a searching inquiry—one that is most appropriately conducted by a

4    factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.

5    1996). The Ninth Circuit has "emphasized the importance of zealously guarding an employee's

6    right to a full trial, since discrimination claims are frequently difficult to prove without a full

7    airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest*,

8    360 F.3d at 1112. Therefore, Plaintiff has demonstrated a genuine dispute of material fact and

9    Defendant's motion for summary judgment on this claim is DENIED.

10       **D.    Retaliation Claims**

11       To establish retaliation under both § 1981 and WLAD, Plaintiff must prove (1) she

12    engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was

13    a causal connection between the protected activity and adverse employment action. *Ruggles v.*

14    *Cal. Polytechnic State Univ.*, 797 F.2d 782, 785 (9th Cir. 1986); *Lodis v. Corbis Holdings, Inc.*,

15    292 P.3d 779, 786 (Wash. Ct. App. 2013). Adverse employment actions are actions by an

16    employer that are "harmful to the point that they could well dissuade a reasonable worker from

17    making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548

18    U.S. 53, 57 (2006). For example, an adverse employment action could be "the closing of the job

19    opening to [a plaintiff] and the loss of opportunity even to compete for the position." *Ruggles*,

20    797 F.2d at 786.

21       If Plaintiff can establish the prima facie case, "the burden of production shifts to the

22    defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment

23    decision. If the defendant is successful, the plaintiff must then prove by a preponderance of the

24    evidence that the proffered reasons are pretexts for retaliation or that a discriminatory reason

25    more likely motivated the employer's action." *Id.* (internal quotations omitted).

26       //

1

2

3

       1.   <u>Prima Facie Case</u>

*Protected activity*: It is undisputed that Plaintiff's claim to the NAACP was a protected activity and the Court agrees.

4

5

6

7

8

*Adverse employment action*: Plaintiff claims she suffered 4 adverse employment actions:

(1) the issuance of a notice of discipline following the 2013 incident with Mr. Wetmore;
(2) her transfer after the 2013 incident with Mr. Wetmore;
(3) the refusal to consider her for the Unit Director position in 2014; and
(4) her "unwarranted" low performance review from Mr. Rasmussen in 2015.

9

(Dkt. No. 27 at 26.)

10

11

12

13

14

15

All of these could constitute an adverse employment action. First, negative performance reviews, negative employment record notices, and transfers, even without a dock in pay, can be adverse employment actions. *See Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000) (discussing various Ninth Circuit cases). Further, a denial of a job opportunity can also be an adverse employment action. *Ruggles*, 797 F.2d at 786. Therefore, Plaintiff has demonstrated that she suffered adverse employment actions.

16

17

18

19

20

21

22

23

24

*Causal connection*: Plaintiff is unable to establish a causal connection for retaliation claims 1 and 2. Both the issuance of her notice of discipline and her transfer due to the 2013 incident with Mr. Wetmore occurred *before* Defendant was notified that Plaintiff filed a complaint with the NAACP. (*Compare* Dkt. No. 28-17 (dated May 21, 2013) *with* Dkt. No. 28-22 (dated May 29, 2013)); (*see also* Dkt. No. 28-7 at 12) (Ms. Volmer stating, "[w]e'd already had her at Arlington" when Defendant got the complaint letter from the NAACP). Therefore, there is no causal connection between her protected activity and the adverse employment action. Plaintiff's first two retaliation claims are DISMISSED. The motion for summary judgment on these claims is GRANTED.

25

26

In regards to Plaintiff's third retaliation claim, Defendant argues that Plaintiff's claim fails because the questions about Plaintiff's NAACP complaint were asked 15 months after the

complaint was filed. (Dkt. No. 31 at 11–12.) While the timing between protected activity and adverse employment action can be significant, Plaintiff has met her minimal burden to establish the prima facie case on this claim because it is undisputed that questions about her NAACP complaint were asked at her interview. The fact that it was still being asked about 15 months later is what is suspect.

Finally, Plaintiff has provided evidence that Mr. Rasmussen knew about her complaint to the NAACP when he completed her 2014 performance evaluation. (Dkt. No. 28-28 at 19.) Therefore, she has met her minimal burden in proving that a reasonable trier of fact could find a causal connection between her protected activity and low performance evaluation.

In sum, retaliation claims 1 and 2 are DISMISSED and Defendant's motion for summary judgment on these claims is GRANTED. However, Plaintiff has met the prima facie case burden for her third and fourth retaliation claims. The Court will continue with the retaliation analysis as to those two remaining claims.

2.   Legitimate Nondiscriminatory Reason

Defendant states that Plaintiff was not hired for the 2014 position because she "was not the strongest candidate by any objective measure." (Dkt. No. 22 at 14.) Mr. Rasmussen had more financial experience, which is what the Monroe Club was looking for at that time. (Dkt. No. 28-7 at 19–20.) This is a legitimate nondiscriminatory reason for Plaintiff's third adverse employment action.

As for her low performance evaluation, Mr. Rasmussen stated in the 2014 performance review that she needed to improve her communication with him and work on being open to criticism. (Dkt. No. 28-38 at 2.) Defendant has also provided emails that demonstrate that Plaintiff was openly hostile to Mr. Rasmussen on multiple occasions. (Dkt. No. 23 at 119, 143–45.) These are legitimate nondiscriminatory reasons for her fourth adverse employment action.

//

ORDER
PAGE - 15

1

###### 3. Pretext and Motivating Factor

2  Defendant argues that Plaintiff cannot establish pretext because Plaintiff was treated the

3  same as all the other applicants, she was encouraged to apply for the position, the hiring process

4  was fair and transparent, and Defendant "welcomed her continued employment." (Dkt. No. 22

5  at 13–14.) However, a reasonable trier of fact could find that asking about Plaintiff's protected

6  activity at the interview, and then denying Plaintiff the position after she said she did not regret

7  filing the complaint, is circumstantial evidence that Plaintiff was retaliated against for her

8  protected activity. Therefore, the motion for summary judgment on Plaintiff's third retaliation

9  claim is DENIED.

10  Defendant also argues that Plaintiff has failed to show any connection between Mr.

11  Rasmussen's knowledge about her NAACP complaint and her performance review. (Dkt. No. 31

12  at 12.) Defendant essentially argues that Plaintiff's evaluation from Mr. Rasmussen is consistent

13  with documentation that Plaintiff was insubordinate to and hostile towards Mr. Rasmussen prior

14  to the review. (*Compare* Dkt. No. 28-88 at 2 *with* Dkt. No. 23 at 119, 143–45.) Plaintiff counters

15  that Mr. Rasmussen's higher level of scrutiny of her work was caused, at least in part, by his

16  knowledge of her NAACP complaint. (Dkt. No. 27 at 14–15.) By demonstrating Mr.

17  Rasmussen's knowledge of her protected activity prior to giving her a poor performance

18  evaluation, Plaintiff has done enough to create a genuine dispute of fact that this was a

19  motivating factor for the alleged retaliation. *See Chuang*, 225 F.3d at 1124 (holding that

20  plaintiffs generally need to "produce very little evidence in order to overcome an employer's

21  motion for summary judgment"). Therefore, the motion for summary judgment on Plaintiff's

22  fourth retaliation claim is DENIED.

23  In sum, Plaintiff's first and second retaliation claims are DISMISSED and Defendant's

24  motion for summary judgment on these claims is GRANTED. However, Defendant's motion for

25  summary judgment on Plaintiff's third and fourth retaliation claims is DENIED.

26  //

1

**III.    MOTION TO SEAL**

2

3       The parties filed a stipulated motion to seal documents attached to Defendant's separate

4  motion for an independent medical exam (Dkt. No. 33). The Court starts from the position that

5  "[t]here is a strong presumption of public access to [its] files." W.D. Wash. Local Civ. R.

6  5(g)(3); *see also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). However, a

7  particularized showing of good cause will suffice to warrant sealing discovery documents

8  attached to non-dispositive motions. *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172,

9  1180 (9th Cir. 2006). The documents filed under seal contain private medical and personal

10  information about Plaintiff. The Court concludes that the parties have made a particularized

11  showing of good cause. Therefore, the motion to seal (Dkt. No. 33) is GRANTED.

**IV.    CONCLUSION**

12       For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 22) is

13  GRANTED in part and DENIED in part and the parties' stipulated motion to seal (Dkt. No. 33)

14  is GRANTED. Ultimately, the claims that remain are Plaintiff's discrimination and retaliation

15  claims in regards to the 2013 and 2014 Unit Director positions and her retaliation claim in

16  regards to Mr. Rasmussen's supervision and performance evaluation.

17       DATED this 7th day of March 2017.

18

19

20

21  John C. Coughenour
    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

ORDER
PAGE - 17